## THE STATE v. HARVEY W. SALMON, Appellant.

### Division Two, February 2, 1909.

1. **GRAND JURY: Stenographer.** It is contrary to the statute (Sec. 2495, R. S. 1899) to introduce into the grand jury a stenographer to take down the evidence of other witnesses for the use of the grand jury, whether the court stenographer or other person, or whether a witness or not, unless such stenographer is the clerk and a member of the grand jury.

2. ———: ———: **Prejudicial: Indictment.** An indictment returned by a grand jury, before whom the official stenographer of the court appeared as a witness for the State, and then, without being further sworn, remained and took down the testimony of the other witnesses in shorthand, and at the close of the taking of the testimony read her notes so taken to the grand jury who had to pass upon the question of finding or not finding a true bill, should, on defendant's plea in abatement, be abated and for naught held. The error is not harmless, and defendant need show nothing more, in order to have his plea in abatement sustained.

3. ———: **Secrecy: For Benefit of Defendant.** While the secrecy and safeguards thrown around a grand jury are not for the benefit of the defendant, yet his rights in the investigation of charges before the body are entitled to the protection of the courts, and among those rights is the substantial one of an orderly and impartial investigation of his conduct from the very inception of the prosecution.

4. ———: ———: **Who May Be Present.** No one has any right to be present in the grand jury room except its members, the prosecuting attorney or his assistant, and one witness at a time. If a stenographer can go before the grand jury as a witness for the State and then remain and take notes of the testimony of other witnesses and read them to its members, so could the prosecuting witness, if he were a stenographer; and so could a stranger, who is not a stenographer, after he is sworn for the State, take down the testimony of other witnesses in longhand and read his minutes to its members; and so could witnesses generally against the defendant, witnesses of prominence and influence, give in their testimony and then stand around in the grand jury room, watching and listening to the examination of other witnesses, and simply because they said or did nothing it could not be said that their presence was harmless. There should be no opportunities for improper suggestions and influences.

5. ———: **Clerk.** The affirmative provision of the statute providing for the appointment by the grand jury of one of their number to act as clerk to keep the minutes of its testimony, excludes the right of any other person, who is not a member of the grand jury, to act as such clerk.

6. **BANK DEPOSIT: Check.** Where a check is drawn upon a bank in favor of the prosecuting witness and presented to the cashier of the same bank for payment, and he pays the witness a part of the amount directed by the check to be paid, and places the balance as a credit to the witness's account in the bank, the balance so credited to the witness is, in contemplation of law, a deposit in such bank of so much money. And where the officers of the bank are prosecuted for receiving money on deposit when they knew the bank was in an insolvent condition, proof of an acceptance of the check by the bank and the giving of credit to the payee of the balance, is proof of the deposit of an amount of money equal to such balance. The giving of credit by the bank to the depositor of the check is practically and legally the same as paying the money to the depositor and receiving the cash again on deposit.

7. ———: ———: **Evidence of Contents.** The check itself is the best evidence of its contents. It is error to permit the prosecuting witness to state that the check was drawn on a certain bank, its amount, and by whom drawn, unless a failure to produce the check itself is reasonably accounted for. But it is proper to permit the witness to testify that he presented the check to the bank, the amount paid on it, what was done with the balance, and what took place between him and the cashier, for those things are not revealed by the check.

8. ———: **Private Bank: Prima-Facie Insolvent.** It is not error to instruct the jury that the failure of the private bank is prima-facie evidence that the owners thereof had knowledge that the banking institution was in a failing condition. That proviso of the statute applies to private as well as to incorporated banks. It is not necessary, in order for the State to make out its prima-facie case of the private bank's insolvency, to show that its owners were insolvent.

9. ———: ———: ———: **Knowledge of Defendant.** Having instructed the jury that the failure of the private bank is prima-facie evidence that the owners thereof had knowledge of its failing condition, it was error for the court to further emphasize the provisions of the statute by telling the jury that it was the duty of defendant, one of the owners of the private bank, to know the financial condition of the bank, and that the law presumes he did know its condition at the time the money was received on deposit.

10. ———: **Knowledge of Unsafe Condition: To put Defendant on Inquiry.** The instruction charged that "if the jury believe from the evidence that the defendant had knowledge of the facts and circumstances showing that the bank of Salmon & Salmon was in a critical and unsafe condition, then the knowledge of such facts and circumstances showing the unsafe and critical financial condition is competent evidence tending to prove that defendant had knowledge of the insolvency of the bank, and would authorize the jury, if they saw proper, to find the fact of knowledge by defendant of the condition of the bank" on the day the money was received on deposit. "But upon the other hand, the court instructs the jury that evidence that facts and circumstances sufficient to put defendant upon inquiry as to the condition of the bank were brought to his attention is insufficient, of itself, to justify his conviction, unless the jury believe from all the evidence in the case that defendant, on or before" said date "had knowledge that Salmon & Salmon were insolvent, or in failing condition." *Held*, to savor strongly of a comment on the evidence, and should not have been given.

11. ———: ———: ———: **Request for Modification: Estoppel.** And the fact that defendant requested that said instruction be modified, which request was granted, does not estop him from complaining of the error of the court in giving the instruction.

12. **CIRCUMSTANTIAL EVIDENCE: Instruction.** If the testimony consists alone of circumstantial evidence, an appropriate instruction concerning the subject should be given; but if there is positive or direct evidence as to some essential elements necessary to constitute the offense, then it is not error to refuse an instruction upon circumstantial evidence. But in any case where the court undertakes to declare the law upon the subject of circumstantial evidence, the instruction should cover the subject fully.

13. **BANK DEPOSIT: Insolvency: Evidence: Examiners' Reports.** Reports of bank examiners made to the Secretary of State are properly admissible in evidence in a prosecution of the owner of a private bank for assenting to the reception of money on deposit with knowledge that the bank was in failing condition. They are official papers, made by officers acting under oath and bond.

14. ———: ———: ———: **Conversations: Letters.** But conversations between an attorney for the bank and the Secretary of State, asking for a postponement of an examination, and conversations between outsiders and officers of the bank, and letters of the bank examiners which are in no way connected with the reports of such examiners, in which the defendant had no participation, are not admissible evidence.

Appeal from Benton Circuit Court.—*Hon. C. A. Denton*, Judge.

REVERSED AND REMANDED (*with directions*).

*J. D. Lindsay* and *W. M. Williams* for appellant.

(1) The court erred in overruling the plea in abatement to the indictment. (a) It stands admitted by the answer to the plea that a stenographer, who was not a member of the grand jury, was present in the grand jury room, by the express direction of the court, and at the request of the prosecuting attorney and the grand jury, and took notes in shorthand of the testimony of the witnesses then being examined in reference to the charge against the defendant, and which resulted in returning the indictment against him. The whole framework of the grand jury's organization, and the safeguards of secrecy thrown around its deliberations, exclude the idea that anyone, other than those permitted by statute, may participate in its proceedings or be present during the consideration of matters coming before it. It was a palpable violation of the statute for the court to direct an outsider to remain in the grand jury room, and it cannot be said in this case that the error was harmless. There is no such admission in the pleadings. State v. Sullivan, 110 Mo. App. 75; State v. Brown, 38 Atl. 331; Com. v. Berry, 92 S. W. 936; State v. Watson, 34 La. Ann. 669; Wilson v. State, 13 So. 225; United States v. Edgarton, 80 Fed. 374; Lewis v. Com., 74 N. C. 194. (b) The grand jury was in session fifteen days. The plea in abatement alleged that after the witnesses had testified and while the jurors were considering the charge against the defendant, the stenographer was called upon to read her notes of the testimony for their information, to the great prejudice of the defendant. The statute contemplates that the jurors shall make

their presentments upon their own recollection of the testimony, and not upon unauthorized notes taken by an outsider, acting without the sanction of any official oath, and without legal authority. This case is much stronger than where a stenographer simply took notes of the testimony to be subsequently transcribed for the use of the prosecuting officer. It is not harmless to permit a grand jury, in finding an indictment, to rely, in whole or in part, upon an unauthorized statement by an outsider undertaking to give the testimony relating to the charge. State v. Thomas, 99 Mo. 261; State v. Sullivan, 110 Mo. App. 83; United States v. Kilpatrick, 16 Fed. 675. (c) The stenographer was a competent witness to prove the facts stated in the plea in abatement. She was not asked concerning anything that took place while she was before the grand jury as a witness; but concerning her actions while she was there unlawfully in the capacity of a stenographer. State v. Grady, 12 Mo. App. 361; State v. Grady, 84 Mo. 220; State v. Cole, 145 Mo. 672. (2) Evidence of assent to the deposit of a check is insufficient to support a charge of an assent to a deposit of money. R. S. 1889, sec. 1945; State v. Mispagel, 207 Mo. 557; Lory v. People, 229 Ill. 268; Carr v. State (Ala.), 16 So. 155; Lewis v. State (Tex.), 12 S. W. 736; Thalheim v. State (Fla.), 20 So. 938; Otero v. State (Tex.), 17 S. W. 1081; Com. v. Howe, 132 Mass. 250; Alston v. State, 92 Ala. 128. (3) It was error to permit the prosecuting witness to testify to the contents of the check in the absence of evidence showing its loss or destruction, or the inability of the prosecution to produce the paper itself. Morton v. Heidorn, 135 Mo. 608; Oconnell v. Nicholson, 67 Mo. App. 657; Lewin v. Dille, 17 Mo. 64. (4) The court erred in permitting to be read in evidence against the defendant the reports made by the Bank Examiners to the Secretary of State in the year 1895 and subsequent thereto. It was not shown that defendant had any knowledge of

the contents of these reports.  They were statements
made up by the Bank Examiners of the result of their
investigations as to the condition of the bank and mere
hearsay so far as defendant was concerned.  (5) The
seventh instruction improperly told the jury that it
was defendant's duty, as a member of the firm of Sal-
mon & Salmon, to know the financial condition of said
bank at all times, and that the law presumes that he
did know it.  This practically eliminated the defense
of want of knowledge of the insolvency of the bank
or of its failing condition.  Wakeman v. Dolly, 51 N.
Y. 27; Murray v. Lumber Co., 9 N. E. 634; Pier v.
Hanmore, 86 N. Y. 102; Stebbins v. Edmands, 78 Mass.
203; Briggs v. Spaulding, 141 U. S. 132; State v.
Myers, 38 Pac. 299.  (6) The third instruction, telling
the jury that the failure of the Bank of Salmon &
Salmon on the 20th of June, 1905, was prima-facie evi-
dence that defendant had knowledge of its failing cir-
cumstances on the second of June, 1905, was erroneous.
(a)  Under the statute, as amended in 1895, now sec-
tion 1945, to constitute the offense by a private banker,
"the owner or owners" of such private bank must be
known to be insolvent or in failing circumstances.  The
bank cannot be insolvent unless the owners are.  Roby
v. State, 51 S. W. 1114; State v. Caldwell, 44 N. W.
700; Meadowcroft v. People, 45 N. E. 307; State v.
Krasner, 83 N. E. 498.  (b)  The statute does not de-
clare that the failure of a private bank shall be prima-
facie  evidence of knowledge that the "owner or
owners" were insolvent or in failing circumstances
when the money or property was received on deposit.
The statute as to prima-facie case is confined by its
terms to incorporated banks or banking institutions.
R. S. 1899, sec. 1945; Roby v. State, 51 S. W. 1114;
State v. Kelsey, 89 Mo. 623.  (7)  (a)  The court,
having given instruction 5, at the instance of the State,
upon circumstantial evidence, committed error in re-
fusing 5, asked by defendant, informing the jury of

the character of circumstantial evidence necessary to authorize a conviction. State v. Sasseen, 75 Mo. App. 203; State v. Woodward, 111 Mo. 256; State v. Moxley, 102 Mo. 388; State v. Crone, 209 Mo. 331. (b) Instruction 8 was a comment upon the evidence and should not have been given. State v. Sivils, 105 Mo. 530; State v. Homes, 17 Mo. 379. (c) Defendant could not be convicted on the ground of negligence in failing to examine the books of the bank to ascertain its condition, and, under the evidence, instruction 3, asked by him, should have been given. Utley v. Hill, 155 Mo. 264; State v. Tomblin, 48 Pac. 144. (8) The verdict of the jury is not sufficient to sustain the judgment. Where the jury makes a special finding all the elements necessary to constitute the offense must be included in the verdict. State v. Modlin, 197 Mo. 376; State v. Cronin, 189 Mo. 663; State v. Pollock, 105 Mo. App. 278; People v. Cummings, 49 Pac. 576; Holmes v. State, 78 N. W. 642. (9) The demurrer to the evidence should have been sustained and defendant discharged, for the more important and better reason that the evidence was wholly insufficient to sustain the charges. The testimony entirely failed to show knowledge by defendant at the time of the deposit of the insolvent or failing condition of Salmon & Salmon. Wiley v. Hill, 155 Mo. 264; State v. Tomlin, 48 Pac. 144; State v. Dunning, 107 N. W. 927; State v. Wells, 134 Mo. 238. (10) This court will order the reversal of a judgment and the discharge of a defendant when the evidence is insufficient to justify or support a conviction. State v. Gordon, 199 Mo. 561; State v. Morney, 196 Mo. 43.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) That a stenographer, not a member of the grand jury, was present in the grand jury room, taking

in shorthand the testimony of witnesses, or reading to the grand jurors such testimony when transcribed, or furnishing a copy to the prosecuting attorney of such testimony, was not sufficient ground to invalidate the indictment. The law requires that, to have such effect, it must be alleged in the plea and shown by the evidence that the defendant was prejudiced by reason of such facts. R. S. 1899, sec. 2535; State v. Sullivan, 110 Mo. App. 75; State v. Bates, 148 Ind. 610; State v. Brewster (Vt.), 42 L. R. A. 444; State v. Miller, 95 Iowa 368; Shattuck v. State, 11 Ind. 473; Courtney v. State, 5 Ind. App. 356; State v. Clough, 49 Me. 575; State v. Kimball, 29 Iowa 267; Bennett v. State, 62 Ark. 516. On the hearing of the plea in abatement no attempt was made to show that the presence of the stenographer tended to prejudice the rights of the defendant. The defendant offered to prove that the stenographer was called upon by the grand jury to read from her notes as to what the testimony of the witnesses was, and that she did read her notes of their testimony. State v. Bates, supra. By Sec. 2495, R. S. 1899, the grand jury is authorized to appoint one of their number a clerk to preserve the evidence given before them. That is precisely what the grand jury did in this case, except that the stenographer was not a member of the grand jury. In the offer of proof made by defendant in this case, it was not claimed that the stenographer was guilty of any fraud in taking down the testimony or in reading the same to the grand jury, or that there was anything in her conduct that in any manner prejudiced the rights of the defendant. It is shown by the evidence that the stenographer was sworn as a witness, took the statutory oath of secrecy and testified as a witness before the grand jury. She was, therefore, incompetent to testify on the hearing of the plea in abatement as to any fact or thing which came to her knowledge while before that body. R. S. 1899, sec.

State v. Salmon.

2490. But as defendant made an offer of proof as to her testimony and no prejudice was shown to the defendant's rights by the facts so offered to be proven, the question as to her competency as a witness is of no importance on this appeal. Authorities cited supra. (2) Defendant complains that there was a total failure of proof, on the part of the State, of the offense charged, for the reason that the indictment alleged the assenting to receiving a deposit of $200 in money, while the evidence showed a deposit of a check, but failed to show a deposit of money. It was shown in evidence that James Paul, on the date mentioned in the indictment, presented to the Salmon & Salmon Bank a check drawn on that bank, and that he received a part of the sum for which the check was drawn in cash, and was given a credit for the sum of $200 by the bank. This evidence sustained the allegation in the indictment of a deposit in the bank by James Paul of the sum of $200 in money. R. S. 1899, sec. 2534; State v. Sattley, 131 Mo. 464; State v. Mysenburg, 171 Mo. 28; 2 Morse on Banks and Banking, sec. 569; Bolles on Banks and their Depositors, 26, 27, 28, 29, 30; Oddie v. Bank, 45 N. Y. 735; Bank v. Burkhardt, 100 U. S. 686; Market v. Hartshorne, 3 Keyes (N. Y.) 137; Levy v. Bank, 4 Dall. 235; Bank v. Burns, 68 Ala. 267; People v. Bank, 77 Hun 159; People v. Sheppard, 37 App Div. (N. Y.) 119. (3) Reports of the bank examiners showing the condition of the Salmon & Salmon Bank, and filed in the office of the Secretary of State, were clearly competent to show the condition of the bank. State v. Sattley, 131 Mo. 488. (4) The court did not err in instruction 3, given on behalf of the State. The statute upon which this prosecution was based expressly provides that the failure of the bank or banking institution shall be prima-facie evidence of knowledge on the part of such officer or person that the same was insolvent or in failing circumstances, when the money or property was

received on deposit. R. S. 1899, sec. 1945. It has been decided by this court that the statutory presumption applies in the case of a private bank. State v. Buck, 120 Mo. 479. While the statute does not make the failure of a bank prima-facie evidence of knowledge that the owner or owners of the bank were insolvent or in failing circumstances when the money or property was received on deposit, the insolvency of such owner or owners is not an element of the offense charged in the second count of the indictment, nor was such insolvency made an element of said instruction 3. State v. Darrah, 152 Mo. 539. (5) The court did not err in refusing defendant's instruction 5. This instruction was based upon the theory that the State was relying upon circumstantial evidence alone. There was clearly direct evidence in this case, in connection with the statutory presumption of knowledge, to authorize a verdict of guilty, and the fact that there was circumstantial evidence in proof of certain facts in the case would not entitle the defendant to an instruction on circumstantial evidence. State v. Crone, 209 Mo. 331. Instruction 5, given for the State, authorized the jury to find the fact of defendant's knowledge of the condition of the bank from facts and circumstances. This would not entitle the defendant to an instruction on circumstantial evidence on the whole case. "An exception to detached portions of instructions will not be considered." Hughes on Instructions to Juries, sec. 346; Bell v. Spokane, 30 Wash. 508. The court did not err in refusing instruction 2, asked by defendant. This instruction was in the nature of a demurrer to the evidence, and as there was evidence tending to prove the defendant's guilt of the offense charged, it was not the duty of the court to weigh such evidence, and, therefore, the instruction was properly refused. State v. Richmond, 186 Mo. 71; State v. DeWitt, 152 Mo. 76; State v. Smith, 190 Mo. 706; State v. Frank, 159 Mo. 535; State v. Williams, 199

Mo. 137; State v. Warner, 74 Mo. 83; State v. Williams, 149 Mo. 496.   (6)  The verdict of the jury is sufficient to sustain the judgment.  The verdict of the jury is a general verdict and finds "the defendant guilty as charged in the indictment," and it was not necessary that it should contain a finding on each material fact of the offense charged.  State v. McGee and McGraw, 181 Mo. 312; State v. Smith, 190 Mo. 728; State v. Modlin, 197 Mo. 376; State v. Bohle, 182 Mo. 58.

FOX, J.—This cause is now pending before this court upon appeal by the defendant, Harvey W. Salmon, from a judgment of the circuit court of Benton county, convicting him of having unlawfully assented to the reception into the bank of Salmon & Salmon of certain money of the value of more than $30, with the knowledge that said bank of Salmon & Salmon was at the time of receiving such deposit in failing condition.

There is practically no dispute as to the facts of this case; in fact, the learned Assistant Attorney-General, with commendable frankness in his oral argument before this court, conceded that the statement of facts as made by counsel for appellant was substantially correct.

The grand jury of Henry county, at the September term, 1905, returned into court an indictment charging the defendant and his co-owner of said private bank, Dr. George Y. Salmon, now deceased, jointly with the offense as heretofore designated.  The charge in the indictment embraced two counts.  The first charged that George Y. Salmon and Harvey W. Salmon, on the 2d day of June, 1905, being the owners of a certain private banking institution, known as the Salmon & Salmon Bank, doing business in Henry county, in the State of Missouri, unlawfully and feloniously did assent to the taking and receiving on deposit in said Salmon & Salmon Bank "a certain deposit of

money, to-wit, two hundred dollars of the value of two hundred dollars, the money and property of one James Paul," while said bank and the said George Y. Salmon and Harvey W. Salmon, the owners thereof, were then and there insolvent and in failing circumstances, and after the said George Y. Salmon and Harvey W. Salmon, owners of said bank, "had knowledge of the fact and well knew that said bank and the said George Y. Salmon and Harvey W. Salmon, the owners thereof, were insolvent and in failing circumstances."

The second count is exactly like the first, except it only charges that George Y. Salmon and Harvey W. Salmon, at the time of the deposit, "had knowledge of the fact that said Salmon & Salmon Bank was then and there insolvent and in failing circumstances." It does not contain the allegation of knowledge that the owners of the bank were insolvent, as is alleged in the first count.

The case was sent by change of venue to the circuit court of Benton county.

At the March term, 1907, of the Benton county circuit court, the defendant filed a plea in abatement to the indictment. The plea alleged that while the grand jury of Henry county, which returned the indictment, was in session and had under investigation the alleged offense charged against the defendant and was examining witnesses touching their knowledge of the alleged offense, one Flora Keil, a stenographer, who was not a member of the grand jury, was present in the grand jury room, by the direction of the prosecuting attorney, and remained there during all of said investigation and took in shorthand all the questions asked the witnesses during said investigation and the answers made by said witnesses and all the evidence taken by the grand jury concerning said alleged offense, and afterwards transcribed the same for the use of the prosecuting officers; and during said inves-

tigation did consult with the prosecuting attorney and inform him and others assisting in said prosecution as to the matters and things testified to by said witnesses; that said Flora Keil was also present in the grand jury room while the grand jury was in session and was considering and deliberating upon returning said indictment against the defendant, and before the vote was taken on said question, and read to the members of said grand jury from her stenographic notes parts of the testimony of the witnesses that had been previously examined during said investigation; all of which was in violation of the statutes of the State of Missouri appertaining to the secrecy of proceedings before grand juries, and to. the great prejudice of the defendant. Defendant prayed that he be permitted to make proof of the facts and that the court, upon the hearing thereof, order that the indictment be abated and for naught held. The plea was duly verified by defendant.

The State filed an answer to the plea in abatement, which admitted that the circuit court of Henry county instructed said grand jury investigating the charge against the defendant and of which he stands indicted "to keep an accurate and correct account of all its proceedings and that all the proceedings be taken down and made a matter of record; and that in pursuance of the instructions and with the knowledge of the said court, and at the request of the said grand jury, the said Flora Keil, having been sworn as a witness, did take down in shorthand the questions propounded by said Attorney-General and the Assistant Attorney-General, and the prosecuting attorney of Henry county and the answers thereto, as well as the questions and answers propounded by the members of the grand jury, and did thereafter transcribe a part of the same," and furnished copies to the prosecuting officers, and no one else. The answer further alleged that Flora Keil took the statutory oath as a witness

before the grand jury and testified before that body, and was not present and did not take any part in the deliberations of the grand jury, and was not present while the jury was considering and discussing the evidence produced before it, and alleged that her presence did not in any manner operate to the harm or prejudice of the defendant.

When the issues raised by the plea in abatement and the answer thereto came on to be heard, defendant, to sustain said plea, called Miss Flora Keil as a witness. She testified that she was a stenographer and was present before the grand jury at the September term, 1905, when it had under consideration the failure of the Salmon & Salmon Bank and the indictment of the defendant, and took down in shorthand the testimony given by the witnesses before the grand jury at that time; that the grand jury was in session some fifteen days.

In response to a question on the part of the State, she said she was sworn as a witness before the grand jury and took the usual statutory oath, and was asked some questions by the grand jury and answered the same. The State thereupon objected to the testimony of the witness on the ground that she was sworn, taking the usual statutory oath before the grand jury, and that she could not be permitted to state what transpired in the grand jury room, which is made secret by the statute. The court sustained this objection, to which the defendant excepted.

The defendant then offered to prove by the witness that she was called upon by the grand jury during its session at the September term, 1905, prior to the finding of the indictment in this case, after witnesses had testified and left the room, to read to the grand jury from her notes what the testimony of these witnesses was; and that she did read to the grand jurors the notes of the testimony of such witnesses. This offer was objected to by the State for the reasons

above stated, and the objection was sustained and the defendant again excepted.

The court then overruled the plea in abatement and defendant saved his exceptions.

Upon the trial of the case James Paul, the prosecuting witness, was called by the State and testified that he was a farmer, thirty-eight years of age, residing ten miles northwest of Clinton, in Henry county, Missouri, and in June, 1905, did business with the banking firm of Salmon & Salmon. He was then asked, on the part of the prosecution, to state whether on the second of June, 1905, he deposited any money with that bank, and, if so, the amount thereof and the kind and character of money and with whom. He answered that on the second of June he had a check of Redman & Kemper, who were in the butcher business; that he did not remember the amount of the check, but he took out a part of it and left $200 on deposit with the bank. After further questions, the inquiry was made: "Q. What did you deposit in the bank of Salmon & Salmon, the check? A. The check."

Defendant's counsel then objected for the reason that the indictment charged the deposit of $200 of lawful money of the United States, and that this charge was not supported by proof that he deposited a check and that the evidence was incompetent and immaterial. The objection was overruled and the evidence admitted and defendant excepted.

During the progress of the examination of this witness, the State, over defendant's objection that the check was the best evidence of its contents and that there had been no proof of its loss or destruction, was permitted to prove by the witness that he had taken a check, drawn on the bank of Salmon & Salmon for about $315 or $320, to that bank, and had received about $115 or $120 in money from the bank, and that he was given credit on the books of the bank for the remainder of the check, $200. An exception was saved

to the ruling permitting the witness to state the contents of the check.

The certificate showing the organization of the private bank of Salmon & Salmon on the 26th of September, 1877, by George Y. Salmon and Harvey W. Salmon, was introduced in evidence.

R. M. Cook, bank examiner, was then introduced as a witness. He testified to a visit made by Walter Owen, Esq., an attorney of Clinton, to the Secretary of State, at Jefferson City, on the 4th of June, 1905, at which time Mr. Owen made a statement that the bank of Salmon & Salmon had been examined in the preceding January, and that to conduct another examination, which was about to be done on the 6th of June, 1905, might cause a run upon the bank and endanger the institution, and asked that the examination then about to be made be postponed. He further stated that in a subsequent conversation with Dr. George Y. Salmon and T. M. Casey, he was told by them that Mr. Owen had made this request at their instance.

All this testimony was objected to by defendant on the ground that there was no proof tending to show that he had any knowledge of this request or that he had instigated it or was in any manner connected with it, and that it was incompetent against him in a criminal case. This objection was overruled by the court.

Witness Cook then testified that the examination was postponed, but that he kept in close touch with the bank and, on the 20th of June, 1905, learned that the bank was in trouble and that its paper had gone to protest; that he took the train for Clinton immediately and arrived there on the early morning of the 21st of June, 1905, and took charge of the bank and closed it up. It was found to be insolvent. That an application was made for a receiver, and John B.

216 Sup—31

Egger was appointed receiver by the circuit court of Henry county, Missouri, and that the receiver qualified and took possession of the bank about the 27th of June. The witness also produced reports of the various bank examiners previously made to the Secretary of State and explained the methods of examination employed by the examiner, and the manner in which these reports are made up. The witness further said that, from his examination of the official reports of the bank examiners, he thought the bank was insolvent in 1896, and continued so from that time until June, 1905, when it was closed. He also read from the individual ledger that on June 2, 1905, James Paul, the prosecuting witness, was debited with $27.50, and, on the same day, credited with $200, leaving a balance of $1,480.62, and that these were all the entries that appeared on his account of that day.

Defendant made timely objection to this testimony on the ground that the evidence showed that the credit of $200 was not a deposit of money and that the entry simply showed that he was given credit for that amount in the bank and had no tendency to show that money to that amount was deposited on that day, which was overruled and an exception properly saved.

The witness was also permitted to state that this entry, in the usual and ordinary course of bookkeeping, indicated that there was a deposit entitling Mr. Paul to a credit of $200 on the books of the bank. An objection on the part of the defendant that this was a mere conclusion of the witness and that it did not appear from the books whether money or check was deposited, was overruled.

Witness then produced the various reports made by the bank examiners to the Secretary of State of the results of their examinations, beginning with the first examination under the statute in 1895. The defendant, Harvey W. Salmon, did not sign any of these statements, and there was no evidence to show that

they were ever called to his attention or that he knew anything of the contents. Defendant objected to the reports of the bank examiners of the result of their respective investigations on the ground that the defendant had nothing to do with these reports; that they were simply statements made out by the bank examiners as to the result of their examinations, and that defendant was not connected with them and could not be bound by them, and they were mere recitals by the examiners of their findings and, as to him, these various reports were hearsay. The court overruled this objection and admitted the reports of the bank examiners in evidence.

Letters to and from the Secretary of State's office in regard to the condition of the bank were also offered in evidence and admitted over defendant's objections.

Mr. Cook testified that when he took possession of the bank there were $4,000 or $5,000 in money in the vaults; that the books showed deposits amounting to something over $700,000, with total liabilities of something like $800,000, counting capital, surplus, undivided profits, due—banks, and so on; that the bank was closed by the Secretary of State on Monday, June 21, 1905, and was located in Henry county, Missouri.

On cross-examination, the witness stated that he first went to Clinton on the 5th of June, 1905, and at that time found Dr. Salmon and Mr. Casey in charge of the bank. Defendant, Harvey W. Salmon, was not there. That, when he went back on the 20th of June, after the paper of the bank had gone to protest, he found Mr. Casey and Dr. Salmon, but did not see defendant, Harvey W. Salmon, and that he never talked to defendant Salmon before the bank failed in regard to the trip of Mr. Owen to Jefferson City nor ever had any communication with defendant about postponing the examination of the bank; that defendant's account with the bank, at the time it closed,

showed a credit in his favor, but he could not state the exact amount thereof.

On redirect examination, he stated that he went to see defendant on his visit to Clinton on-the 20th of June; that defendant then showed him some reports that had been made to him from time to time, of the condition of the bank, and said that he had been receiving reports of its condition.  The impression of the witness was that he said he had been receiving daily reports, but he could not be positive about that.

On recross-examination, he testified that in this conversation with Major Salmon in which he told him that he had been receiving reports of the condition of the bank, defendant said he thought the condition was good, and that, from these reports, he all the time thought the bank was in good condition and was never more surprised in his life than when the bank closed; and that he showed witness the reports that he had been receiving.

Mr. Williams F. Crome had been doing business with the Salmon & Salmon bank probably ten years and had a standing deposit therein, in 1904 and 1905, between $40,000 and $50,000.  Prior to the failure he had withdrawn between $20,000 and $30,000.  He talked to Casey, who was acting as general manager of the bank.  Casey was the son-in-law of Dr. Salmon.  Mr. Crome was asked concerning a conversation with Casey about the withdrawal of his money from the bank, which was objected to by defendant on the ground that it would have no tendency to prove the offense charged against the defendant in this case or knowledge of the insolvency of the bank on his part.  The objection was overruled and the witness stated that he approached Mr. Casey several times, telling him that he expected to withdraw ten thousand dollars, for instance; that, in reply, Casey asked, "Well, must you have it at once?"  The witness told him not absolutely at once, but as soon as possible; that Casey answered

that the bank would pay witness $5,000 in about a week and $5,000 in two weeks later. This was in 1904. This witness also testified to a conversation with the defendant, Major Harvey W. Salmon, at the Planters House, in St. Louis, within the first six months of the year 1904, in which he stated that he told Major Salmon, at that conversation, that he had received a reliable report that the bank of Salmon & Salmon was not as safe as it should be, and that if he had any money there he had better take care of it; and further stated to defendant that the cashier, Mr. Casey, looked very much worried and showed that he had more or less trouble; that defendant answered that Casey had plenty of help and could have all the assistance he wanted, and that he could get all the money that he wanted, etc., and gave witness to understand that the bank was all right and not in a failing condition. The witness also testified to a like conversation in regard to the condition of the bank with Casey, at the bank of Salmon & Salmon, in Clinton. He said that he had seen Major Salmon in the bank building within three or four years prior to its closing, but had not seen him behind the counter.

The defendant said, in reference to this conversation, that he did not recollect the conversation as Mr. Crome had stated it, but that if Mr. Crome had asked him, he would have told him that the bank was absolutely solvent, because he had entire confidence in it, and that he certainly told him so if the inquiry was made.

W. W. Adamson, for the State, testified that he was a farmer and stock raiser, fifty-nine years old; that he knew Major Salmon, had seen him frequently at the bank within three or four years before it closed, but did not know whether he had seen him behind the counter in that time; that defendant was in the actual management of the bank prior to the time that Mr. Casey took charge of it; that he had money in the

bank at the time of the failure amounting to nearly $20,000, which he tried to get but was unable to do so; that defendant, after the failure, told him he thought he would get every cent of his money; that he thought there was enough to pay out.

Daniel F. Blake was the trustee in bankruptcy for the estate of Salmon & Salmon, appointed by the District Court of the United States, and was in charge of the property and assets of the bank at the time of the trial. He testified to the amount of the assets that he took into his hands and that these assets were very much less than the liabilities.

Henry Starke testified to having a deposit in the bank and to some efforts made to draw it out and to conversations with Mr. Casey about it.

C. A. Krone said that he was frequently in and out of the Salmon & Salmon bank and about there; that he did business with the bank and knew the defendant, Major Harvey W. Salmon. He was asked whether or not, during the last three or four years, he had seen the defendant frequently about the bank, and answered: "I remember seeing him about the bank one time, yes, sir. He came out of the little back room there; private office, suppose it was." He said that this was in 1903 or 1904.

A number of letters written by the Secretary of State to Salmon & Salmon were introduced in evidence and are set out in full in the record. One of them, by Secretary Lesueur, based upon the examination of Mr. Oldham and objecting to the condition of the bank, was shown to the defendant, about the time it was written, which was after Oldham's examination in 1900. After that, however, there was a conference in Kansas City between the Secretary of State, Captain Lesueur, the bank examiner, Dr. Salmon and Mr. Oldham, and the method of conducting the business in the future agreed upon at the time. Subsequent to this, reports were made to Captain Lesueur

by Mr. Casey, and the Secretary of State wrote a number of letters, after the Kansas City interview, that the bank was being put in good condition and was making satisfactory progress.

On the 25th of July, 1900, the Secretary of State wrote as follows:

"I have this day received and carefully examined your report of the 23rd inst., and am pleased to say that it shows very satisfactory progress."

He also wrote on the 25th of June soon after the Kansas City conference, a letter hereinafter copied.

On August 25, 1900, the Secretary of State wrote: "Your report of the 24th inst. has been received and carefully examined, and I am pleased to say that it shows that you are still pushing matters along the right line."

On October 2, 1900, a letter from the Secretary of State contains this statement: "I have received and carefully examined your report of the 26th ult., and while it does not show as good a condition as I had hoped for, it does show that you have been actively at work along the proper lines."

James Paul, prosecuting witness, recalled, testified that when he presented the check at the bank, Casey gave him the money that he received on it; that Casey said that Redman & Kemper's checks would be honored there, and he accepted a check with their names to it, and drew some of the money on it; that he drew some of the money on the check and told Casey he would leave the balance there with the bank.

John B. Egger testified that he was receiver of the bank, and that it was not solvent in 1900; that the nominal value of the assets that came to his hands was $800,000, but that the actual value was in the neighborhood of $120,000. He gave an account of what he collected and the value of the property of the bank. On cross-examination he said that one casually looking over the books of the bank could not have deter-

mined whether it was solvent or insolvent, and that it would have required a careful examination to ascertain that fact; that there were false entries on the books and the accounts were manipulated so as to cover up the bank's condition as well as possible; that there were a large number of forged notes in the bank in the handwriting of Mr. Casey, the proceeds of which were used and applied on the George M. Casey debts and on the Champion, Concho and Panasco Cattle Company's debts, and some on the Casey & Tower's debts, he thought; that this forged paper amounted to something over $120,000, and was used to pay the debts just mentioned. Witness also stated that defendant, at the time of the failure, had something over $5,000 to his credit on the books of the bank; that he had examined defendant's account for eight or ten years, and that during all that time there was always a balance on the books to his credit. That the account of the county was manipulated by Mr. Casey, so that the books showed that the liability to the county was $36,000 less than it really was, and the liabilities were more than the books showed, and the withdrawals from the account of the county had gone to the payment of the debts of George M. Casey, father of Mr. T. M. Casey, the manager, or to the cattle company's notes. Some of them went to George M. Casey, but he did not know that all did. Witness also testified that, at the time of the failure of the bank, the books showed that Casey was declaring dividends or profits, and that up to the time of the failure the accounts showed that the bank was making money, and that the last dividend was carried to the credit of the owners in December, 1904.

On redirect examination, he said that old notes to the bank that began back in the eighties, cattle company paper and a good deal of the paper of G. M. Casey, father of Mr. Casey, carried from the late eighties, and the early nineties, constituted a bulk of

the indebtedness that was taken care of by the forgeries, amounting to over $100,000. He also testified in regard to the indebtedness of Salmon & Salmon Bank to other banks, and the method of keeping the accounts, and what the books showed in regard thereto. This witness was examined at length in regard to the condition of the bank and what the books showed.

W. A. Oldham, who was bank examiner under Captain Lesueur, from April, 1897, to July 1, 1900, testified to his examinations of the Salmon & Salmon Bank, and the methods by which they were made; that his first examination was on the 13th of April, 1898, and Mr. Casey was the manager. He also testified to examinations subsequently made by him. Over defendant's objections, he was allowed to read to the jury from his reports to the Secretary of State, under the head of "General Remarks," what he said to the Secretary of State in said reports as to his opinion of the condition of the bank. Witness stated that, during the month of March, 1900, soon after making his last examination of the Salmon & Salmon Bank, he was in Kansas City and had a short conversation with the defendant, Major Harvey W. Salmon, in which witness told the defendant that his bank was in a failing condition, unless they got immediate relief, and he didn't see how they were going to survive; that defendant didn't say much about it, kind of seemed to be impatient about it, and said that will be attended to or looked after, or something of that kind; didn't seem disposed to talk about it.

The witness then testified that subsequently he had the question up with Captain Lesueur, Dr. Salmon and T. M. Casey as to the financial condition of the bank; that they had a meeting at an office in Kansas City; that Ben. Reed, the chief bank clerk, was also present; that the condition of the bank was taken up and discussed pretty thoroughly to determine what was best to do in the premises; that at that conference

they went down the line of the paper and questioned the parties very closely about it in detail, and that, being some two or three months after the examination, Mr. Casey reported, when witness was reading down the line, that various amounts had been paid on some of the notes, and some had been taken up since witness was there, which, according to the statement of Casey, showed that they were doing something toward cleaning up that paper; that witness quit the department on July 1, 1900; that some of the paper that was in the bank in 1888 or 1886 proved to be worthless; that witness, from his subsequent examinations, made up his mind that the bank was really insolvent as far back as eight or ten years from the time of his first examination. Witness also went into detail in regard to the statements from the books and the accounts of the bank, and was examined fully upon that subject, and also in regard to the statements made by the bank and the examiner's reports.

Witness, on his cross-examination, was shown the statement of the bank's condition made on the 30th of November, 1904, in the handwriting of Mr. Casey, and subscribed and sworn to by G. Y. Salmon. He said that this statement, upon its face, showed the bank to be in a pretty fair condition, and that such statements were required to be published in the county papers; that the statement did not correspond with the books; that his first examination was made in 1898; that, at that time, he found Mr. Casey in charge of the bank; that he did not see the defendant, Harvey W. Salmon, on that visit; that the witness on each of his visits, beginning in 1898, made a careful and complete examination, as far as he could go into the details as a bank examiner; that he went there for the purpose of finding out the condition of the bank and endeavored to do so; that none of the statements made to him were ever signed or sworn to by Major Salmon; that the witness made another examination in April,

1899, and went through the bank's affairs with the
same care as before and for the same purpose, and
that he had made the third examination in March,
1900; that, at the time of each of the examinations,
he found Mr. Casey in charge of the bank, and never
saw Major Salmon there at any of the times; that
he was not around the bank or in it while the witness
was there; that he did not know whether the makers
of the notes that were in the bank were solvent in
1888 or not; that they might have been perfectly sol-
vent and good in 1888 and insolvent in 1904; that he
could not say whether the bank was insolvent in 1888
without knowing whether the makers of the notes held
by it were solvent; that this could not be determined
by merely looking back over ten years of the books;
that he saw Major Salmon in Kansas City at the Mid-
land Hotel, after making an examination in March,
1900; that he would not undertake to say the exact
words that he used in talking to Major Salmon, but
that he told him, in effect, that his bank was in a failing
condition, unless something was done; that, unless
they did something, and did it very soon, there would
be a disastrous failure; that, after this conversation,
he called a meeting at Kansas City to do something;
that there was present Captain Lesueur, Dr. Salmon,
Mr. Reed, Mr. Casey and the witness; that Major
Salmon was not there; that when he started to talk
to the defendant about the bank, the defendant didn't
say much, but said that it would be looked after, or
something of that kind; that Captain Lesueur re-
mained Secretary of State, after the meeting in Kan-
sas City, until the following January; that the meeting
was in June.

The record further discloses that, after the alleged
conversation between Oldham and Major Salmon at
Kansas City, subsequent to Oldham's examination of
the bank in the spring of 1904, a conference was held
in Kansas City, as hereinbefore stated, at which Dr.

G. Y. Salmon, Mr. Casey, Secretary Lesueur, Bank Examiner Oldham and Mr. Reed were present. The situation of the bank was discussed and certain requirements made by the Secretary of State as to the conduct of its business. Later, on the 25th of June, 1900, the Secretary wrote this letter, which was offered in evidence by the State:

"City of Jefferson, June 25, 1900.

"Gentlemen—After conference with your Mr. Casey at Kansas City yesterday, I am led to believe that your institution is in a fair way to be brought back in line, and if the efforts that have been put forth in the past sixty days are continued, it will only take a few months to place it beyond criticism. It will take active and energetic work, though, to do it, and it must be continued until every slow, doubtful and inactive asset is eliminated. I will ask you to report to me monthly, stating in detail the disposition of the matters heretofore complained of, until further notice."

This sufficiently indicates the testimony as introduced upon which the State relies.

At the close of the State's case defendant requested an instruction in the nature of a demurrer to the evidence, which again raised the objection that there was no proof of the deposit by James Paul of $200 or any other sum in money in the bank of Salmon & Salmon on the 2d of June, 1905, as charged in the indictment, and that the deposit of a check would not support the charge preferred against the defendant. This request was denied by the court.

The defendant then proceeded to introduce his testimony. He called as a witness A. B. Chamier, official stenographer of the Boone Circuit Court, who stated that he took the testimony of Mr. Oldham, at the June term, 1906, in reference to the interview with Major Salmon at Kansas City, and he thought his notes of the testimony were taken correctly; that the witness, Oldham, was asked: "Did you have a

conversation with him at that time?'' and he answered: ''I undertook to have a conversation with him.

''Q. For what purpose?  A.  I wanted to discuss the condition of his bank with him.

''Q. What did you say to him, if anything?  A. I went into his room and told him that I had come to talk to him about the condition of his bank.

''Q. Did you tell him what you found to be condition of his bank from your examination?  A.  No, sir.

''Q. Did he give you an opportunity to do so? A.  No, sir.

''Q. Was that all?  A.  All in regard to the bank.''

The defendant then introduced a number of witnesses to show that the defendant was not connected with the management of the bank after 1890, and took no active part in the business subsequent to that date; that he was rarely about the bank, and never for the purpose of conducting the business; that Mr. Casey was the manager during part of that time, and the brother of the defendant, Dr. Salmon, was the adviser in regard to the conduct of the business.  Mr. Parks, Senator Dickinson, Dr. Menees, Paul Tyler, Dr. Britts, Thomas J. Lingle, Major Landon and others were called to establish that fact.

Defendant, Harvey W. Salmon, testified in his own behalf that he was born in South Carolina in 1839, his father removing to Missouri in the same year and locating in Morgan county, where he lived until 1858; that after the war he went to Clinton and engaged in the banking business, and that he and his brother composed the partnership of Salmon & Salmon, private bankers, from about 1872 until the failure of the bank; that the witness was the manager of the bank until the fall of 1890, when he gave up absolutely all control over it and active work in it; that he was away from Clinton in November, 1890, and after that never took

any direct management of the bank; that he was consulted some times about the affairs of the bank, but never looked over the books after that time; that he received reports frequently from Mr. Casey, who was the son-in-law of his brother, Dr. G. Y. Salmon, and that he was in the bank occasionally just like any other depositor, but not otherwise; that he was in St.Louis on the day the bank was closed, returning from Louisville, Kentucky; that about five o'clock in the afternoon a message came to him by telephone that the drafts of the bank had gone to protest; that this was the first time he had ever heard that the bank was in failing condition; that he went immediately home and found the bank closed and the Secretary of State in charge of it; that he had every reason to believe the bank was solvent and no reason whatever to expect anything else; that he had never had any suspicion in regard to the solvency of the bank; that there were times in their business when they didn't have as much money in the safe as defendant thought they should have, and he so told Casey; that this was simply a matter of business caution; that Casey reported to him from time to time about the condition of the bank, sometimes got daily reports; that these reports always showed the bank to be absolutely good; that witness had entire confidence in Mr. Casey's integrity and ability, and had no reason for thinking otherwise; that he did not know there was any forged paper made out to the bank or carried upon its books, and never was told of any such a thing until after the bank closed; that he did not know that one dollar had been drawn to pay the debts of Geo. M. Casey.

Defendant further testified that he did not recollect the conversation testified to by Mr. Crome, but that if he had been asked about the condition of the bank, he would have answered that it was absolutely solvent, because he had confidence in it.

Defendant stated that he knew of a letter written

by Captain Lesueur calling. attention to certain demands that should be complied with by the bank. Witness was not certain whether he received a letter or whether he was told personally. He immediately talked to Mr. Casey about it and told him that it must be done; that Lesueur's requirements were perfectly correct and ought to be and must be met, and that Casey later assured him that this had been done, and, as defendant did not hear anything further from Mr. Lesueur, he supposed it had been done, as asked.

The witness said he did not remember any conversation with Mr. Oldham at Kansas City about the bank being in a failing condition. He was not invited to a conference between the Secretary of State, Oldham, Reed, Casey and his brother, and didn't know of any such a conference until he heard the deposition in regard to it read; that his health had been bad, and that he was frequently away from Clinton, sometimes for several months at once. He never borrowed a dollar for his own private use from the bank, and had a balance to his credit when the bank closed. All of his property was lost in the failure. After he quit the actual management of the bank, he deposited considerable money with it. He put in $60,000 of his own money at one time after he quit the active management of the bank, and all of it was lost with the balance of the money of the bank; that at another time he deposited $8,000, which he received from a life insurance policy.

Defendant further testified that he did not know, at the time the bank closed, that it owed one dollar; that he never read any of the letters to the Secretary of State or from the Secretary of State given in evidence, and that they were never called to his attention, except the one which Captain Lesueur showed him or called his attention to; nor did he ever hear or see anything of the reports of the bank examiners that were read in evidence. He saw reports published in the

local papers, and they showed the bank to be in good condition. He knew the law required bank examinations, but he was not called upon by any of the bank examiners when the examinations were made.

He testified that he remembered the time that George M. Casey, father of Mr. Casey, failed; that about that time defendant was taken ill and was in St. Louis; that his oldest son came to him and told him there was a little run on the bank and that Casey was very nervous and wanted some money. Defendant said Casey had plenty of money. He was speaking according to what he understood to be true; and he further said that Casey must get along as he was; that he would not raise any money; to let him run the business and he must do it. His son told him that he thought sending them a little money might make him feel better. His son afterwards told him that he talked to Mr. McDonald, who used to live in Clinton and was in the banking business in St. Louis with the Germania Trust Company; that Mr. McDonald said he was wrong about it; that he ought to send Casey up whatever money he needed. He then went over to the bank and signed a note for $10,000 and sent the currency up to the bank by his son.

Defendant said that it was not unusual for banks to borrow currency to meet contingencies or emergencies, and that he did not think anything about it; that this was six or eight months before the bank closed; that when George M. Casey died, he inquired about his indebtedness and was told by Tom Casey that every dollar of it was secured and would be paid; that all the reports made to him and all the information he got from all sources indicated that the bank was making money; that he thought at the time of the failure he was worth two or three hundred thousand dollars, and that he never profited a cent by the failure of the bank; that every cent he had was swallowed up except exemptions allowed him by law that he had to take to live on.

On cross-examination, defendant stated that, at one time, he was worth from $200,000 to $300,000, which was all gone; that he looked to his investments in the bank principally for his income, although he tried to do some little business on the outside; that his dividends were always put to his credit while the bank was running, and that they averaged some $5,000 or $6,000 a year; that George M. Casey, father of Tom Casey, the manager of the bank, was not only indebted to the bank, but also to the defendant individually for a large amount, and that witness, after the death of George M. Casey, spoke to Tom Casey about this indebtedness to the bank and to himself; that Tom Casey said George M. Casey owed very little to the bank; that it was not enough to cause defendant any uneasiness; that George M. Casey died in 1904, and that he failed in business in August, 1903, although witness could not state the date definitely; that the slight run that witness spoke of on the bank when he was asked to get money in St. Louis by his son for Casey, was made following the failure of George M. Casey; that witness told his son, in answer to Casey's request, that Casey should look after the funds himself.

The witness further stated that he was not asked by his brother in 1895 or 1896 to take charge of the bank; that his brother may have asked him why he did not take charge of it, but that witness could not have done so on account of his health. The defendant could not now state just what it was that Mr. Lesueur wanted done in the bank, but there were some things that he wanted attended to. That Casey went into the bank in 1896; that he was about there looking after his father's business, and assisting his father-in-law, before that time, but witness did not think he was on a salary by the bank; that he took charge and relieved Dr. G. Y. Salmon in about 1896. That during all that time, defendant and his brother, G. Y. Salmon, were

216 Sup—32

equal partners in the bank, and that each had the right to sign the other's name in any of their business affairs, but that they did not exercise that right very frequently.

Over the objections of counsel for defendant, the State was permitted upon cross-examination to make inquiry as to the cattle business in which the defendant had been interested. We shall not reproduce the testimony of the defendant upon this cross-examination. Such testimony is by no means a controlling point in this case. Manifestly counsel for the State as well as the appellant recognize that fact, for that testimony and the action of the court in regard to it was not discussed either in the briefs or in oral argument.

Defendant further testified that he served as State Treasurer for two years and had always taken an interest in public affairs; that he had a wide acquaintance throughout the State and followed practical banking for many years; that he managed the bank of Salmon & Salmon himself, and built up its business and attended to the details, and carried the burdens, until he turned it over.

He was asked if he stated in his deposition at Clinton that he was notified by Captain Lesueur that the bank was in a precarious condition and that he took hold of the matter and went over the paper, so as to put it in proper shape. Defendant said that he did not remember whether Lesueur notified him personally or he saw Lesueur's letter; that he did go over the matters that Lesueur complained of and to which he called attention, and that he probably asked for a statement of the bank's condition at that time. He also stated that he had a matured policy on his own life for $8,000 or something like that, that he collected and deposited in the bank; that he only knew through T. M. Casey of a policy on the life of G. M. Casey deposited with the Salmon & Salmon Bank.

The defendant was frequently in St. Louis; that his children lived there, or some of them; that he usually stopped at the Planters Hotel; that he could not state how much time he spent there, and would not feel like making an estimate of it. Two of his boys lived there before the failure of the bank, but he could not give the number of years; that he has lived in St. Louis since December, 1906.

On redirect examination he said that he knew nothing about Walter Owen going to Jefferson City to ask for a postponement of the examination of the bank; that he never requested anybody to ask for a postponement and never heard of any such request, and knew nothing about it.

This sufficiently indicates the nature and character of the testimony relied upon by the defendant as a defense to this prosecution.

At the close of the evidence the court instructed the jury. We shall not burden this statement with a reproduction of the instructions but will give such instructions, the correctness of which are challenged, due consideration during the course of the opinion. The cause was submitted to the jury and they returned the following verdict:

"We, the jury, find the defendant guilty as charged in the indictment of unlawfully assenting to the reception into the bank of Salmon & Salmon of money to the value of more than thirty dollars, with the knowledge that the bank of Salmon & Salmon was then in failing condition, and assess his punishment at three years in the penitentiary.

"Z. T. WICKLIFFE, Foreman."

Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Sentence and judgment were entered of record in conformity to the verdict returned, and from this judgment the defendant prosecuted this appeal, and the record is now before us for consideration.

## OPINION.

The record in this cause discloses numerous assignments of error. We will give the complaints of the appellant such consideration as their importance requires.

The first proposition confronting this court is the complaint earnestly challenging the correctness of the action of the court upon the plea in abatement filed in the trial court.

We have fully indicated in the statement of this case the nature and character of this plea, as well as the answer to it filed by the respondent. Briefly stated, the facts upon which the plea in abatement are predicated are, that Flora Keil, a stenographer, at the request of the grand jury, and with the knowledge and sanction of the court, appeared before the grand jury and reported in shorthand the testimony given by the witnesses before the grand jury in this cause. It further appears that she was a witness on the part of the State in this prosecution, and that she took the usual statutory oath as a witness and testified to whatever facts were within her knowledge concerning the charge against the defendant. Upon the issue presented by the plea in abatement, Miss Flora Keil was introduced as a witness. She testified that she was a stenographer and was present before the grand jury at the September term, 1905, when it had under consideration the failure of the Salmon & Salmon Bank, and the indictment of the defendant, and took down in shorthand the testimony given by the witnesses before the grand jury at that time; that the grand jury was in session some fifteen days. At this juncture, the State, through its representative, made the inquiry of this witness as to whether or not she was sworn as a witness before the grand jury; as to whether or not she was asked questions by the grand jury and answered the same. The answer to this inquiry was in the affirma-

tive. Thereupon the objection was, interposd by the State to the testimony of the witness on the ground that she was incompetent by reason of being a witness before the grand jury, and should not be permitted to state what transpired in the grand jury room, which is made secret by the statute. The objection as urged by the State was sustained by the court, the defendant properly preserving his exceptions to such ruling. The defendant then offered to prove by the witness that she was called upon by the grand jury during its session at the September term, 1905, prior to the finding of the indictment in this case, after witnesses had testified and left the room, to read to the grand jury from her notes what the testimony of these witnesses was, and that she did read to the grand jury the notes of the testimony of such witnesses. This offer of proof was also objected to by the State and the objection sustained, and the defendant again excepted. The court then overruled the plea in abatement.

The correctness of the action of the court upon the plea in abatement was challenged in the trial court and is now the first question presented to this court for its consideration.

The contention of learned counsel representing the State and the appellant may thus be briefly stated: The learned Attorney-General insists that it was incumbent upon the defendant to show that some substantial right of the defendant was prejudiced by reason of the facts as heretofore indicated, and even conceding that it was improper for the stenographer to be present with the sanction of the court and perform the acts as heretofore stated, yet under the showing as made in this cause they should be treated as harmless.

On the part of the appellant it is earnestly urged that the facts as heretofore indicated and the acts performed by the stenographer under the sanction of the court and the prosecuting attorney constitute

serious error, and absolutely vitiate the action of the grand jury in returning an indictment under such circumstances.

This sufficiently points out the highly important question which is presented for our consideration, and the correct solution of it must be sought alone by a proper interpretation of the rules of law applicable to the subject.

The question as to the finding of indictments by grand juries, and the order and method of finding such indictments, has frequently been in judgment before the courts of this country, and not unlike the adjudications upon many other subjects the rulings of the courts have not been entirely uniform; however, a careful review of all the authorities upon this proposition clearly indicates that in the final analysis the occurrences before the inquisitive body must be looked to for the correct determination of the question as to whether or not the action of the grand jury in its investigation was orderly and appropriate and in conformity with the spirit of the law which directs and regulates their investigations.

Directing our attention to the adjudications in this State we find that this question, the first and only time it has reached an appellate court, was in the case of State v. Sullivan, 110 Mo. App. 75. It was expressly ruled in that case that even though it be desirable to take notes of the testimony of witnesses called before the grand jury, such fact would not justify the employment of a stenographer, whether the court stenographer or other person for that purpose, who is not a member of the jury.

Section 2495, Revised Statutes 1899, provides that the grand jury may appoint one of its members clerk to preserve the minutes of the testimony given before them, and the Court of Appeals in the Sullivan case interprets this affirmative provision of the statute providing for the appointment of a member of the grand

jury as a clerk as an exclusion of the right to intro-
duce any other person into the presence of the grand
jury for the purpose of taking testimony.   What was
said in that case is so appropriate to the discussion of
the proposition in the case at bar, that we feel warran-
ted in quoting the exact language of the court.   It was
said: "The statute does not contemplate the presence
of any other person than the members of the grand jury
and the prosecuting attorney and his assistant.   In-
deed, the whole framework of the jury's organization
and the safeguards of secrecy thrown around it and
its deliberations, excludes the idea that anyone else
may sit in its presence, or aid in the performance of
its duties.   It is a manifest impropriety (under the
present condition of legislative action) for any other
person to be present.   The fact that it was deemed de-
sirable to take notes of the testimony of witnesses call-
ed before the body does not justify the employment of
a stenographer (whether the court stenographer or
other person) for that purpose who is not a member of
the jury.   This is evident, not alone from the whole
framework of exclusiveness and secrecy of its organ-
ization, as well as the silence of the statute in that re-
spect, but an affirmative provision of the statute ex-
cludes the right to introduce such a person into the
presence of the jury for such purpose.    For it is pro-
vided (section 2495) that the jury 'may appoint one of
*their number* to be clerk thereof, to preserve the min-
utes of their proceedings and of the evidence given be-
fore them.'   So strictly was the secrecy of the grand
jury maintained that it was formerly held that a juror
disclosing to an accused the evidence heard in the jury
room made the juror an accessory to the crime charg-
ed."

In that case it was held that the trial court prop-
erly denied the plea for the abatement of the indict-
ment.   However, it will be observed that the State
filed an answer to the plea in abatement, averring the

mere presence of the stengrapher and expressly alleging that no harm resulted to the defendant by reason of such presence. To this answer the defendant interposed a demurrer. This demurrer necessarily admitted the allegations of the answer that no prejudice resulted to the defendant by the stenographer's presence. It was upon this admission that the presence of the stenographer was harmless to the defendant that the Kansas City Court of Appeals ruled the complaint against the appellant. That the Kansas City Court of Appeals held that the calling in of a stenographer who was not a member of the grand jury to take notes of the testimony, was improper, and could not be justified, is plainly made manifest by an examination of the opinion rendered in that case, and in the views by that court giving expression to the reasons why such a course was improper and could not be justified, we fully concur.

In State v. Watson, 34 La. Ann. 669, it was expressly ruled that the appointment by the judge of a citizen, who is not a member of the grand jury, as clerk, is unauthorized and can be made the ground for a motion in arrest of judgment.

A similar ruling was made in Welch v. State, 8 So. 673, and in Wilson v. State, 13 So. 225. In United States v. Edgerton, 80 Fed. 374, a witness who had testified before the grand jury was permitted to remain in the grand jury room during the examination of other witnesses in that case. Four indictments were returned against the defendant, and on the ground of the presence of this witness and stranger before the inquisitive body pleas in abatement were filed and sustained by the court. In discussing the proposition the court said: "It is beyond question that no person, other than a witness undergoing examination, and the attorney for the Government, can be present during the sessions of the grand jury. The rule is inherent in the grand jury system with all the

force of a statutory enactment. The cases where bailiffs and stenographers have on occasions been temporarily present in the grand jury room are only apparent exceptions. The rule, in its spirit and purpose, admits of no exception.... There must not only be no improper influence or suggestion in the grand jury room, but, as suggested in Lewis v. Commissioners, 74 N. C. 194, there must be no opportunity therefor. If the presence of an unauthorized person in the grand jury room may be excused, who will set bounds to the abuse to follow such a breach of the safeguards which surround the grand jury?''

In United States v. Virginia-Carolina Chemical Co. et al., decided July 3, 1908, two lawyers were requested and sent out by the Attorney-General of the United States to assist before the grand jury in the beginning and institution of proceedings against the defendant. They were permitted by the court to go before the grand jury and examine witnesses. Under the law they were not authorized to go before the grand jury, and upon this ground pleas in abatement were interposed and such pleas were sustained by the court. It will also be observed that in the pleas in abatement there was nothing alleged tending to show that any improper questions were asked by these lawyers, or any questions propounded that could not be asked by the grand jurors themselves, or the district attorney, but the court held that this would not in any way change the result of the conclusions reached. In treating of this proposition the court expressly approved the doctrine announced in United States v. Edgerton, supra, and then gave expression to its views upon the proposition in hand in this language: ''Their presence there and participation in this investigation was bound to have impressed the jury and conveyed to them the information that the Department of Justice was exceedingly anxious that this indictment be found. Who can say how far-reaching this influence was, and

what effect it had on the individual juror when he came to vote upon the finding of the indictment, *assuming, as we do and must, that the conduct of these special assistants before the grand jury was as circumspect in every particular* as would have been that of the district attorney had he been present and alone conducting the investigation?'' [163 Fed. l. c. 75.]

In Lewis v. Board of Commissioners, 74 N. C. 194, the Supreme Court of that State had under consideration the question of the payment of the fees of witnesses who were not authorized to go before the grand jury or had been improperly directed to go before that body, and in discussing that question the court in no uncertain terms made clear its views upon the question of outside interference with the inquiries being made by the grand jury, and it was there said, speaking of the grand jury: ''Their findings must be their own, uninfluenced by the promptings or suggestions of others, *or the opportunity thereof.* We know there have been wide departures from the principles herein announced, in this and, perhaps, in other judicial districts. It has become necessary, therefore, to review the ground, and recur to the earlier and more correct practice as it was established by those who have gone before us, and has been handed down by tradition and the recollection of the oldest members of the court.''

In State v. Bowman, 38 Atl. 331, the Supreme Judicial Court of Maine expressly ruled that the presence of the official stenographer in the grand jury room participating in the proceedings to the extent of taking and preserving the testimony, vitiated the indictment returned by the grand jury under such circumstances, and it was held that this was a matter that could be taken advantage of by the defendant, and in discussing the proposition concerning the presence of the stenographer, said: ''He was in the grand jury room by express order of the court. He participated in the proceedings to the extent of taking and preserving the tes-

timony. . . . If it be competent for the court to order a stenographer to be present and take stenographic notes of the testimony of witnesses, for such future use as the court might order or the law allow, it might be done in one case only during the whole session, while other matters were investigated in the ordinary way. Should that be done, we cannot tell what influence such a discrimination might have upon the jurors. We think that in some cases it might affect their independence and impair the rights of the accused."

The Court of Appeals of Kentucky, in Com. v. Berry, 92 S. W. 936, used this language in discussing the grand jury system: "The secrecy of the proceedings of the grand jury has from the earliest times been rigidly enforced, the purpose being to free that body from all espionage or intimidation, and to enable them to ferret out violations of law quietly, step by step. If the proceedings of the grand jury are not kept secret, the jurors themselves might be less free to do their duty, and various obstacles might be placed in their way, destroying the independence of the body. The statute providing that no one but the commonwealth's attorney and the witness under examination shall be present is peremptory, and the circuit court erred in directing the stenographer to take down the testimony heard before the grand jury."

In support of the insistence upon the part of the State upon the proposition concerning the propriety of the stenographer remaining in the grand jury room and taking in shorthand the testimony of the witnesses being examined upon the charge against the defendant, our attention is directed to numerous decisions.

In State v. Bates et al., 148 Ind. 610, it was expressly ruled by that court that the presence of a stenographer in the grand jury room at the request of the prosecuting attorney, and the taking down in shorthand for the use of the prosecution the evidence upon which an indictment was returned, is not sufficient

to abate the indictment, without some showing that the accused was injuriously affected thereby. In that case it will be observed that the stenographer was merely present at the request of the prosecuting attorney and took down in shorthand all the evidence given before the grand jury upon which the indictment was returned. Again, it must not be overlooked in the examination of that case that in the statement of it as to the allegation in the plea in abatement, the fact was emphasized that such stenographer was not called before said grand jury as a witness, but was there for the sole purpose of taking such evidence in shorthand, that the same might be copied and used in the prosecution of said cause. Manifestly that does not correspond to the facts in the case at bar. The stenographer in this case was called as a witness; was sworn and testified; remained in the grand jury room and took down in shorthand the testimony of all the witnesses, and at the close of the testimony read it over for the benefit of the grand jury. It will also be noted that in the case last cited, which is now under consideration, the mere presence of the stenographer taking the testimony for the benefit of the prosecuting attorney was made to appear to the court, and as was said by that court in announcing its final conclusion, "it does not appear from the plea in abatement that the shorthand reporter said or did anything in the presence of the grand jury that influenced their action in returning their indictment against appellees," etc.

The next case to which our attention has been called is State v. Brewster, a Vermont case, 42 L. R. A. 444. That case is in line with the last case cited of State v. Bates et al., by the Indiana Supreme Court, and holds that the mere presence of a stenographer, nothing else appearing, is insufficient to authorize the court to abate the indictment. It will be noted, by a careful examination of that case, that the learned judge

fully recognized that the decided cases in courts of last resort, where the proposition now in hand was in judgment before them, are not in accord upon this question, and in announcing the conclusion it will be observed that special care was taken to limit the conclusion reached to the precise point passed upon, and in announcing the conclusion the court very appropriately used this language: "In this review of the decisions of this State and of the decisions of other courts, this court is to be understood as deciding no more than that the irregularities shown in this case, under all circumstances set forth in the plea, are insufficient to abate the indictment. The ends of justice are always best accomplished when the proceedings are strictly in accordance with the provisions of the statute and well-recognized proceedings of the common law. Much care should be exercised that no irregularities should be able to intervene in any proceeding touching the life and liberty of the citizen."

In the case last cited it will be noted that the court ruled that it must appear that the defendant's rights were prejudiced, and then expressly stated that the same rules should apply to the abatement of the indictment found by the grand juries as are applied to the setting aside of verdicts by juries. It was said by the court in that case, touching this question, that "it must be shown to have prejudiced, or be of such a character as would naturally prejudice, his rights. Certainly, no stricter rule should be applied in abating an indictment for such causes than is applied to set aside the verdict of a jury. The rule stated is the one this court has applied to setting aside verdict of the jury."

An examination of that case will clearly demonstrate that the facts upon which the plea in abatement was predicated are in many material particulars widely different. In that case it was the mere presence

of the stenographer taking the testimony in shorthand for the prosecuting attorney. In the case at bar the stenographer was called as a witness for the State against the defendant; was sworn and testified; she was not there alone for the purpose of preserving the testimony for the prosecuting attorney, but was authorized to go there by the court, and the notes of the testimony taken by her were read to the grand jury.

Our attention is next directed to the case of State of Iowa v. Lewis Miller, 95 Iowa 368. Under the statute of Iowa the court was authorized to appoint a clerk who was not a member of the grand jury, and in pursuance of the provisions of that statute the court appointed a practicing attorney as such clerk. It was ruled in that case that the fact that he was an attorney furnished no ground of objection to him acting as such clerk. The only question determined in that case had reference to some questions propounded by this clerk to some of the witnesses who were being examined. He was prohibited under the statute from taking part in the proceedings aside from his clerical duties, and it appearing to the trial court that the questions asked by this clerk were propounded at the request of the foreman of the grand jury and were followed by questions asked by different members of the grand jury, the court simply ruled that, while such practice was not to be commended, yet the questions having been propounded at the request of the foreman of the grand jury, it did not constitute such error as would in any way prejudice the rights of the defendant.

In Shattuck v. State, 11 Ind. 473, to which our attention has been directed, it will be noted that the facts upon which the plea in abatement were predicated were entirely different from the facts in the case at bar. In that case, the prosecuting attorney, under the statute, was authorized to appoint deputies, and he appointed two deputies who went before the grand jury; but it seems that their appointment was not regu-

larly made, and the court simply held that having acted in good faith they were at least deputies *de facto* and performed the duties in good faith, and the defendant's rights were not prejudiced, and refused to abate the indictment.

Courtney v. State, 5 Ind. App. 356, we find is in line with other cases cited by the learned Attorney-General, that the mere presence of a stenographer in the grand jury room to take testimony for the use of the prosecuting attorney is insufficient to abate the indictment. The court, in discussing that case, emphasized the fact that it did not appear that the stenographer said anything in the presence of the grand jury, or that he did anything to influence their conduct, and that it was not shown that any use was made of his reports or of his knowledge, whereby the appellant's rights could have been affected. Manifestly the facts upon which the plea in abatement are predicated in that case are unlike the facts in the case at bar. In this case the stenographer was not only a witness for the State against the defendant and took the testimony, but such notes of the testimony were used after the witnesses had all testified, by reading them to the members of the grand jury.

State v. Kimball, 29 Iowa 267, is another case where it simply appears that a bailiff was temporarily present when the witnesses before the grand jury were being examined.

In the case of Bennett v. State, 62 Ark. 516, the prosecuting officer had a lawyer go before the grand jury in his stead. In that case the lawyer representing the prosecuting attorney did nothing more, as the facts developed showed, than the prosecuting attorney would and could have done had he been personally present. It was ruled in that case that the facts were insufficient to authorize the abatement of the indictment.

In the foregoing we have indicated the adjudica-

tions upon which counsel for the State, as well as the appellant, rely for support in their respective contentions, and the question is now presented to this court for an expression of its views upon the conceded facts pertaining to the plea in abatement now under consideration.

It is manifestly apparent that the facts upon which the plea in abatement were based in the adjudications relied upon by the State in support of the contentions urged, are widely and materially different from the facts upon which the plea in abatement in the case at bar are based. In none of the cases cited was the stenographer or the party present as a witness for the State against the defendant; nor does it appear that the stenographer did anything more than to merely take the notes of the testimony for the use of the prosecuting officer. In the case at bar the stenographer, in the first place, was a witness for the State against the defendant; it further appears that she remained in the grand jury room and took notes of the testimony of all the witnesses testifying before that body, and at the close of the testimony read the notes so taken to the members of the jury who had to pass upon the question of finding or not finding a true bill against this defendant. In reporting this testimony the stenographer was not even acting under the sanction of an oath to correctly report it according to her best ability.

It is earnestly contended by the representative of the State that upon this state of facts the error was harmless, and that it was incumbent upon the defendant, in order to avail himself of any defect by reason of this improper practice, to go further and show that the stenographer did not read correctly to the members of the grand jury the testimony taken before them.

We are unwilling to give our assent to this contention. This stenographer was unauthorized to appear before the grand jury and take the testimony,

and as before stated, she was not even acting under the sanction of an oath.  She was also a witness for the State against the defendant.  If this witness is permitted to go before the grand jury, is sworn and testifies in the case and then take notes of the testimony and reads such notes to the grand jury, we might properly inquire, as was done by the court in United States v. Edgerton, supra, who will set bounds to the abuse to follow such a breach of the safeguards which surround the grand jury?

If this stenographer had the right under the facts as shown in this cause to take notes of the testimony and then read them to the grand jury after the testimony was taken, the prosecuting witness in this cause, if he were a stenographer, would have the same right, and then the defendant would be called upon to show that his notes were incorrectly read to the grand jury.

It is earnestly urged by the State that the secrecy and safeguards thrown around the grand jury are not for the benefit of the defendant.  This may be conceded to be true, but it by no means follows that the rights of the defendant in the investigation of charges before that body are not entitled to protection by the courts of this State.

The substantial rights of one accused or suspected of crime to an orderly and impartial investigation of his conduct begins at the very inception of the prosecution, that is, when the matter is presented to the grand jury.  As was said in the case of Wilson v. State, 70 Miss. 595, "It is a serious mistake to suppose that the right of one accused or suspected of crime to the orderly and impartial administration of the law begins only after indictment. . . . One whose acts are there the subject of investigation is as much entitled to the just, impartial and unbiased judgment of the grand jury as he is to that of the petit jury on his final trial."

If a stenographer who is a witness for the State may go before the grand jury and take the notes of the testimony and read the same to the members of that body, it logically follows that any stranger may be called as a witness for the State, sworn and testify, who is not a stenographer, and appointed or requested to take the testimony in longhand and read his minutes of the testimony after the witnesses have all been examined. Further than this, if, under the facts in this case, the court should hold that it was harmless, where are we to place the limit? Could not witnesses generally against the defendant, witnesses of prominence and influence, stand around in the grand jury room after having testified, watching and listening to the examination of other witnesses for the State, and simply because they said or did nothing is it to be treated as harmless conduct on the part of such witnesses as well as of the members of the grand jury in permitting such a practice? If one person can be admitted, we see no reason why two or three would not have an equal privilege. If all this can be done, and before the defendant can challenge the fair and impartial investigation of the grand jury he is required to point out in detail the prejudice to his rights, such as that the minutes taken by the outsider, or the notes taken by the stenographer, were not correctly taken or correctly read to the members of the grand jury after the close of the examination of the witnesses, then we confess that the views of the profession, as well as the public generally, concerning the grand jury system and the proceedings before such body from the earliest times, go for naught, and the defendant would be absolutely helpless to protect his rights as to a fair and impartial investigation by that body, and the novel situation would confront us that under the forms of law opportunities would be furnished and sanctioned for improper influences and suggestions in the deliberations of that body.

The law and the well-recognized rules governing investigations by the grand jury concerning the commission of criminal offenses are quite easy to comply with; but on the other hand it is extremely difficult for a defendant whose acts and conduct are under investigation to show improper practices of such body and in what particulars his rights would be affected thereby. While every fair-minded citizen recognizes that persons who commit crime should be properly and speedily punished, yet, as was said in United States v. Edgerton, supra, "It is a matter of the highest public policy that crime shall be punished by legal methods, and the officers of the law when acting in the name of the law should be careful not to disregard its plain provisions."

We are unwilling to say that, upon the conceded facts concerning this plea in abatement, the actions of the State's witness and stenographer were harmless. It might be said upon the same ground that it would also be harmless for the grand jury to return an indictment into court upon the statements of witnesses who had not been duly sworn, or to return an indictment without any testimony whatever; yet it certainly would not be insisted that it would be incumbent upon the defendant to show that the statements of witnesses made not under oath were not true or different to the statements they would make if the oath had been properly administered, and the position is untenable that, because the defendant upon the final trial before the jury might make his defense, he should be denied the privilege of insisting upon his substantial right of having an orderly and impartial investigation at the very commencement of the prosecution before the grand jury.

Emphasizing the correctness of the views upon this proposition as herein expressed, the law-making power of this State has at all times fully recognized the rights of a party accused or suspected of crime

whose acts are under investigation before the grand jury. The members of the grand jury at the very inception of their organization take an oath that they will present no one for any hatred, malice or illwill, and that they will present things truly as they come to their knowledge. It must not be overlooked that it is no trivial matter to have a serious charge of crime presented by a grand jury or a prosecuting officer in the courts of this State. Even if upon final trial the vindication may be never so complete, every good citizen abhors the idea of a record being made for all time that he has even been charged with the commission of a criminal offense, and doubtless for this reason the law-makers of this State have at all times indicated by appropriate legislation that his rights at the very inception of a prosecution should be safeguarded. The law contemplates that the members of the grand jury shall be impartial and the right of the accused to challenge the array of grand jurors has been guaranteed from the earliest history of the grand jury system.

Emphasizing the fact that the General Assembly fully recognized that the rights of a person accused or suspected of crime should be safeguarded at the very commencement of a prosecution, we find that since the amendment of the Constitution authorizing prosecutions for felonies upon information by the prosecuting attorney, it is provided that those informations shall be duly verified by the prosecuting officer, and to make sure that such officers make no mistake and improperly charge a defendant upon information with the commission of a serious crime, the statute expressly provides that a preliminary examination in cases of felony shall be awarded the accused before the filing of the information. But aside from all that has been said upon this proposition, that is, that this stenographer was a witness for the State against the defendant; was sworn and testified before the grand jury, retained

before that body, participated in their proceedings to the extent of taking notes of the testimony and reading the notes as taken to the members of the grand jury; that she was there without authority of law; was not an official of the court; was not acting under the sanction of an oath; yet, the best reason why this practice should not be permitted is, that the law does not contemplate it, and as was expressly ruled by the Kansas City Court of Appeals, the affirmative provision of the statute providing for the appointment by the grand jury of one of their number as clerk to keep the minutes of the testimony, clearly excludes the right of any other person, who is not a member of the grand jury, to act as such clerk.

To say that what was done in the grand jury room in the investigation of the acts and conduct of this defendant was harmless, does not, in our opinion, correctly solve this proposition, and upon the conceded facts the leading cases cited by the State applicable to this question are not in conflict with the conclusions herein reached.

In State v. Brewster, supra, it is significant that the learned judge writing the opinion in that case very guardedly limited the decision to the particular facts developed in the case before him. It was also announced in that case that the rule upon a plea for the abatement of an indictment on the ground of irregularities was the same as the rule applied to setting aside verdicts of juries. If that be true, it will certainly not be seriously contended that, if in the trial of a civil or criminal case the stenographer would undertake to read the testimony of the witness in the absence of the defendant, the trial court would stop to inquire as to whether the stenographer had correctly read it or not, or as to whether the rights of the defendant had been prejudiced by reason of such acts on the part of the stenographer. Doubtless upon such a state of facts, upon a motion for rehearing upon that ground,

the trial court would promptly set aside the verdict returned in said cause.

In the other leading case, State v. Bates et al., 148 Ind. 610, as heretofore indicated, it is significant that the court in the statement of that case emphasized the fact that the stenographer was not called before said grand jury as a witness, but was there for the sole purpose of taking such evidence in shorthand that the same might be copied and used by the prosecuting attorney in the prosecution of the case. That is not this case, and it is but fair to presume that, had that court been dealing with a case where the stenographer was a witness for the State against the defendant, sworn and testified in the cause and read her notes of the testimony to the grand jury at the close of the examination of all the witnesses, the court would have reached a different conclusion.

It will be observed that in the numerous adjudications upon this subject the tendency of the courts is to limit the conclusions reached to the particular facts developed upon the issues presented by the plea in abatement. That is clearly suggested in United States v. Simmons, 46 Fed. 65, where the court very clearly distinguishes the facts between the case in hand and the case cited as authority upon the proposition. In that case a stenographer was before the grand jury, but it appeared from the facts developed that he was on the staff of the district attorney and had a right to be before the grand jury, and the court declined to quash the indictment because of his presence before the jury, saying that under the practice the district attorney and his assistant had the right to be there. In treating of that case and distinguishing it from another case to which the court had been referred, it was said: "This case differs from the case decided in the State court of Louisiana, to which reference has been made by the defense. In the case of State v. Natali [not reported] an indictment seems to have

been quashed because of the presence before the grand jury of the shorthand reporter of the court, who was an official having no connection with the district attorney's office, possibly not under his control. That is not this case."

We see no necessity for pursuing this subject further. Upon the facts as developed in this case if it should be held that there was no error or rather that the error was harmless to the defendant, then in our opinion the provisions of the statute as well as the recognized rules tending to throw safeguards around the deliberations of the grand jury should be swept away, and it would be much more in keeping with the proper and orderly administration of justice to abolish the provisions of the statute than to allow them to remain and absolutely disregard them. If the acts of the stenographer in this case are to be treated as harmless, then there is no reason why any and all persons who might desire to be present in the grand jury room while the examination of witnesses is being conducted may not be admitted if the grand jury will so consent. We are convinced that the only way to enforce a strict compliance with the provisions of the law regarding the secrecy and deliberations of the grand jury, and to maintain the usefulness as well as the respect for the result of their investigations, is to abate indictments returned by them where the spirit of the law regulating their proceedings in finding such indictments have been absolutely disregarded. The law makes ample provision, and it is easily followed, for the thorough investigation and the preservation of the minutes of the testimony in such investigations of all offenses committed within the borders of any county. This law should be complied with, and it should not be left to the courts to conjecture whether or not harm was done to persons accused or suspected of crime whose acts are being investigated before that body.

It was plainly the duty of the trial court, upon the disclosures of the record in this cause, to have abated the indictment.

## II.

Notwithstanding we have reached the conclusion upon the first proposition that the indictment in this cause should be abated, yet it would be well to at least briefly suggest the conclusions we have reached upon some of the other most important questions. We shall not undertake to discuss at any length the remaining propositions, but after a most careful examination of them shall be content with a mere announcement of our conclusions.

It is insisted by learned counsel for appellant that there was a total failure of proof on the part of the State of the offense charged, for the reason that the allegation in the indictment that the defendant assented to and received a deposit of two hundred dollars in money, was not shown to have been true by evidence which showed a deposit of a check. In other words, such allegation of the deposit of money was not supported by the evidence.

It is sufficient to say upon this proposition that if by competent evidence it should be shown that a check was drawn upon the bank of Salmon & Salmon in favor of James Paul, and this check was presented to the cashier for payment, and that said James Paul was paid partly in cash and the balance credited to his account in the bank, then in our opinion, in contemplation of law, such balance credited to his account was a deposit in such bank of so much money. This check was drawn upon the bank of Salmon & Salmon and presented to that bank for payment, and when James Paul received such part in cash as he desired and had the balance placed to his credit, this, in contemplation of law, was the payment to him of the amount of money called for in the check.

We are unable to reach the conclusion that, before this money could be treated as a deposit, it was essential, first, that the cashier should count him out the entire amount of money called for in the check for the purpose of allowing him to retain what ready money he desired, and then return the balance for deposit in the bank. This, in our judgment, would be a useless formality, in fact would have been simply playing and trifling with a purely business transaction. This transaction cannot be treated otherwise than a payment of the check in favor of James Paul. He had the right to demand an actual delivery of the amount of money called for in the check, or he could have received part of it and allowed the balance to remain on deposit with the bank, and it is manifest, if James Paul accepted such check in payment of a debt due by the drawer, presented the check to the bank for payment, requesting that they pay him part cash and give him credit for the remainder, the debt of the man who gave him the check was fully satisfied, and he must be treated as having received a part of the money in cash and the balance he deposited with the bank.

In support of the insistence by appellant our attention is directed to the case of State v. Mispagel, 207 Mo. 557. An examination of that case will demonstrate that it falls far short of supporting the contention in the case at bar. The transaction in the Mispagel case differs materially from the transaction in the case now before us. In the Mispagel case there were drafts drawn upon different banking institutions. Those drafts and checks constituted a part of the assets of the bank, and were in fact a species of property belonging to the bank that could be described and identified, and the defendant in that case converted the drafts and checks to his own use and obtained the money from the various banking institutions. Such drafts and checks constituted a separate species of

property, different from the money on deposit in the bank, and were a part of the assets of the bank at St. Charles. They were embezzled and converted to the use of the defendant, therefore it was essential in that case to charge the embezzlement and conversion of the particular species of property. Not so in the case at bar. This was a check drawn upon the bank of Salmon & Salmon, and it was paid, and after its payment the bank had no property rights in that check. It simply amounted to a compliance with the request made by the drawer to pay to James Paul so much money. Manifestly if James Paul had requested the evidence of the transaction in presenting this check under the circumstances as detailed in evidence, and the cashier had sought to comply with such request, he would have simply given him a certificate of deposit for the balance of the money called for in the check, which was not actually paid upon the check itself. Clearly the certificate would not have been for the deposit of the check.

We shall not undertake to review all the authorities to which our attention has been directed. We have carefully reviewed them and find that they by no means settle the proposition now under discussion.

The law upon this proposition is well stated by Morse on Banks and Banking (4 Ed.), volume 2, section 569, where it is said: "When a check is presented for deposit drawn on the depositary bank, the bank may refuse to pay it, or take it conditionally by express agreement, or by usage, if such a one exists, as in California; but otherwise, if it pays the money, or gives credit to the depositor, the transaction is closed between the bank and the depositor, unless the paper proves not to be genuine, or there is fraud on the part of the depositor. *The giving of credit is practically and legally the same as paying the money to the depositor, and receiving the cash again on deposit.* The

intent of the parties must govern, and presenting a check on the bank, with a pass-book in which the receiving teller notes the amount of the check, is sufficient indication of intent to deposit, and to receive as cash.''

The ruling upon this proposition must be adverse to the appellant.

## III.

The court, over the objections of the defendant, permitted James Paul to testify to the contents of the check presented to the bank, that is, he was permitted to state that the check was drawn upon the bank of Salmon & Salmon, by whom it was drawn and the amount.

Manifestly upon the question as to whether this was a deposit of money or a check, it was quite material to show upon what bank this check was drawn. If drawn upon some bank other than that of Salmon & Salmon, and simply deposited in that bank, it may be that a different conclusion would have been reached upon the proposition as to whether it was a deposit of a check or of money; hence, the defendant had the right to insist upon the best evidence being produced to establish this material fact. This check was in writing and clearly under the rules was the primary and best evidence by which to establish that fact. If the State was unable to procure the check, doubtless it was an easy matter to lay the proper foundation for the introduction of secondary evidence. The defendant was clearly entitled, if the check could be produced, to see it and determine from the paper itself by whom it was drawn, for what amount and upon what bank and what date, and it was error for the court to admit, over the objections of the defendant, the verbal statements as to the contents of that check, without first laying the proper foundation for such statements.

In O'Connell v. Nicholson, 67 Mo. App. 657, the

rule is well and tersely stated. The plaintiff in that case, as a witness in his own behalf, testified that he presented a bill to the defendant for the work. Inquiry was then made as to what was the amount of the bill. To this inquiry the objection was interposed that this called for the contents of a written instrument. The objection was overruled by the trial court. The St. Louis Court of Appeals, speaking through Judge ROMBAUER, said: "That this ruling was erroneous admits of no doubt, and in fact it is not sought to be defended in this court. It goes without saying that the *amount stated in the written bill* and the statement contained in it that it was rendered on a certain account, *are both contents of a written instrument* and cannot be established by oral evidence, against the objections of the adverse party, unless the absence of the instrument is satisfactorily accounted for."

It is urged by the Attorney-General that witness Paul clearly had the right to testify to the transaction that took place between him and the cashier at the bank. This may be true respecting the right of the witness to testify to the fact that he presented a check to the bank and the amount of money that was given him upon the check, and the retention of the balance, but it must not be overlooked that the objection to this testimony is that he was permitted to testify to the contents of the check, which was in writing, which doubtless showed upon its face as to what bank it was drawn upon, the amount embraced in the check, as well as its date. This evidence was clearly an effort to establish the contents of an instrument which was in writing, which, under the well-settled rules of evidence, is not permissible until the proper foundation is laid for the introduction of secondary evidence.

## IV.

Complaint is made that the court committed error in its declaration of law in the third instruction, in

which it was said that the failure of the bank of Salmon & Salmon is prima-facie evidence that the owners thereof had knowledge that such banking institution was in failing circumstances. This complaint is predicated upon the provisions of section 1945, Revised Statutes 1899.

The bank involved in this prosecution was a private bank, and it is insisted that the proviso embraced in the statute which states that "the failure of any such bank or banking institution or trust company or institution shall be prima-facie evidence of knowledge on the part of any such officer or person that the same was insolvent or in failing circumstances when the money or property was received on deposit," has no application to private bankers.

It is earnestly and ably argued that unless it was shown that the owners of the bank were insolvent that the bank itself was not in fact in failing condition; hence the statute was not intended to apply to private bankers.

We cannot give our assent to this insistence. The statute is broad and in our opinion includes all classes of banking institutions, incorporated, as well as private banks. The law-making power clearly had the right to distinguish between the separate individual estates of the owners of the bank and the bank itself, and require that the assets of the banking institutions should at all times be in a healthy condition, and that the management and conduct of the business of such bank should be along proper business lines applicable to the particular business which was being conducted.

This proposition, while not so sharply presented as in the case at bar, was in effect involved in State v. Buck, 120 Mo. 479. That was a private bank and a similar instruction to the one to which complaint is now directed was held not to be erroneous. An examination of that case will show that it furnishes an exhaustive review of all the authorities upon this subject,

and Judge Burgess, speaking for this court, in treating of the provisions of the statute, which, so far as the proviso is concerned, is similar to the provisions now in force said: "The statute has direct connection with, and reference to, those who own and operate banks, and does not embrace within its provisions any person not connected therewith. Here the act which makes the failure of any private bank prima-facie evidence of the knowledge on the part of the owner, agent or manager of any private bank or banking institution doing business in this State that the bank was in failing circumstances or insolvent at the time of receiving any deposit has some relation to, and furnishes some evidence of, the alleged offense. . . . The statute enables the State to make a prima-facie case by proof of the deposit and failure of the bank. But the defendant can show the circumstances attending the failure, and any facts tending to exonerate him from liability, and then on the whole case, the burden still rests on the prosecution to establish his guilt beyond a reasonable doubt. The presumption of innocence with which the defendant is clothed, and which never shifts, rests with him throughout, and notwithstanding the prima-facie case made out by the State, it must still go further." Then quoting from State v. Rector, 23 S. W. 1074, it is said: "A prima-facie case will not warrant a conviction."

We repeat that the proviso in this statute is applicable to private as well as incorporated banks, and in the interest of the public dealing with banking institutions, the law-making power manifestly had the right to require that the business conducted with the bank alone shall be conducted upon well-recognized business principles applicable to the management of banks.

Private banks are subject to the same regulation of examination by the bank examiners as incorporated banks, and if the bank examiners report a private bank

in failing condition, manifestly the Secretary of State would not stop to inquire as to whether or not the individual owners of such bank were solvent, but would promptly take such steps to protect the depositors as the law contemplates. The administration of the affairs of the bank as well as its assets and the individual estates of the owners of such bank are entirely two different subjects, and the General Assembly in the act now under discussion was simply dealing, as it had the right to do, with a subject in which the public had a vital interest.

We will not discuss this subject further, but after an examination of all the authorities cited we are content to simply announce our conclusion that this point should be ruled adversely to the appellant.

### V.

It is also insisted that the court committed error in giving instruction number 7. This instruction told the jury that it was the duty of the defendant as a member of the firm of Salmon & Salmon, bankers, to know the financial condition of said bank at any and all times. And the law presumes that he did know the condition of said bank at the time alleged in the indictment the money is charged to have been deposited in the said bank by the witness, James Paul.

It is only necessary to say that the court had, by instruction number 3, properly declared the law under the provisions of section 1945 that the failing condition of the bank of Salmon & Salmon furnished prima-facie evidence of knowledge of such condition on the part of the owners, and it was error for the court to further emphasize the provisions of that statute by telling the jury that it was the duty of the defendant to know the financial condition of the bank, and further declare that the law presumes that he did know the condition of the bank at the time of the receiving of the deposit.

It will be observed that the representative of the State does not undertake to controvert the contention

that this part of that instruction was erroneous, but insists that in view of all the other instructions in the case it was harmless.

## VI.

The correctness of instruction numbered 8 is also challenged by appellant. This instruction was as follows:

"The knowledge of facts and circumstances which would put a prudent and careful man upon inquiry as to whether or not a certain condition existed is competent evidence tending to prove knowledge of the existence of such condition. And if the jury believe from the evidence that the defendant had knowledge of facts and circumstances showing that the bank of Salmon & Salmon was in a critical or unsafe financial condition, then the knowledge of such facts and circumstances showing the unsafe and critical financial condition is competent evidence tending to prove that the defendant had knowledge of the insolvency of the bank, and would authorize the jury, if they saw proper, to find the fact of the knowledge by the defendant of the condition of the bank, on June 2, 1905.

"But upon the other hand, the court instructs the jury that evidence that facts and circumstances sufficient to put the defendant upon inquiry as to the condition of the bank were brought to his attention is insufficient, of itself, to justify his conviction, unless the jury further believe from all the evidence in the case that defendant, on or before June 2, 1905, had knowledge that Salmon & Salmon were insolvent, or in failing condition."

The record discloses that counsel for appellant objected to the giving of that instruction and duly preserved their exceptions to the action of the court in denying their objections, whereupon the appellant requested a qualification of such instruction, which request was granted.

It is only necessary to say of this instruction that after a careful analysis of the terms employed in it we have reached the conclusion that it savors very strongly of a comment upon the testimony and should not have been given, and the fact that counsel for appellant requested a modification of it, in our judgment, should not estop defendant from complaining of the error committed by the court in giving such instruction.

## VII.

It is sufficient to say of the complaint concerning the instruction upon circumstantial evidence that the rules of law applicable to that subject are well settled by this court. If the cause is one in which the testimony consists alone of circumstantial evidence, then it is the duty of the court to give an appropriate instruction covering that subject; but if it be one in which there is positive or direct evidence as to some of the essential elements necessary to constitute the offense, then it is not error to refuse an instruction upon circumstantial evidence. [State v. Crone, 209 Mo. 316.]

However, it is not out of place to say that in any case where the court undertakes to declare the law upon the subject of circumstantial evidence, it should cover the subject fully, and give such an instruction as has frequently met with approval by this court.

## VIII.

It is next insisted that the court committed error in the admission of evidence during the progress of the trial. Our attention is directed to the fact that the reports made to the Secretary of State by the bank examiners were, over the objections of the defendant, introduced in evidence. Reference is also made to conversations between the Secretary of State and one Walter Owen in reference to the postponement of an

examination. There were also other conversations between some of the bank officials and other parties in relation to the condition of the bank.

After a full consideration of this subject we have reached the conclusion that the reports of the bank examiners are properly admissible in evidence in a case of this character. The officers making such examinations are acting under oath and bond prescribed by the provisions of the statute. Their reports are official papers, and we see no valid reason why they are not competent evidence in the trial of a case in which one of the issues tendered is as to the solvency of the bank. The statute makes provision for the examination of banks by certain officials appointed by the Secretary of State, and requires that they make reports of their examinations, and in our opinion there was no error in the admission of the reports as made by the bank examiners. But on the other hand, conversations, such as between Owen and the Secretary of State and other conversations or letters of the bank examiners, which are in no way connected with the reports of such bank examiners, in which the defendant had no participation, are not admissible in evidence and should be excluded.

While ordinarily the acts of one of the partners or officers in charge of the business would be competent as against the other, yet such acts must be concerning the business of the bank that the partner is authorized to transact. If a depositor should apply to a cashier of a bank for money that he had deposited, and the cashier would refuse to pay such money, or state to him that they had no money with which to pay, such statement by the cashier would be clearly competent, for the reason that it is a transaction along the lines of the duties he is required to perform in the management of the business of such bank. It is entirely different to conversations with outsiders that have no sort of connec-

tion with the duties required to be performed in the transaction of the business of such bank.

The law provides for the examination of banks annually, and such other examinations as the Secretary of State may deem proper under the circumstances. The law nowhere contemplates any postponement or delay in the examination of banks, therefore the conversation by witness Owen with the Secretary of State, in which it was sought to postpone an examination, and about which the defendant in this cause had nothing to do concerning such postponement, not even any knowledge that any such delay was sought, or of the conversation by Mr. Owen with the Secretary of State concerning such postponement, even if it be conceded that he was representing the partner of this defendant, could in no way affect the defendant, nor has such testimony any tendency to prove or disprove the issues presented in this cause.

## IX.

We have ruled upon the first proposition presented to our consideration that the indictment in this cause should be abated. We are unable to foreshadow what additional testimony may be introduced by the State as well as the defendant, should the grand jury of Henry county reindict the defendant for the offense charged; therefore, we deem it inappropriate to announce our conclusion upon the question presented as to the sufficiency of the testimony disclosed by the record to warrant a submission of the cause to the jury. We think it but fair to the trial court to indulge the presumption that if upon another trial the testimony failed to show the defendant's knowledge of the failing condition of the bank of Salmon & Salmon or of any other essential element necessary to constitute the offense, it would not hesitate to so inform the jury by an appropriate instruction to that effect.

We have given full expression to our views upon

the first proposition which results in the conclusion that the indictment in this cause should be abated. While we have fully considered the other important questions disclosed by the record, we have been content merely to announce our conclusions upon them.

In accord with the views as herein indicated, it is ordered that the judgment of the trial court be reversed and the cause remanded, with directions that the plea in abatement to the indictment in this cause be sustained, and that the trial court make such other orders as it may deem proper and appropriate.

*Burgess, J.,* concurs; *Gantt, P. J.,* not sitting.